**THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 19-CR-365** |
| | : | |
| **v.** | : | |
| | : | |
| **CHRISTOPHER YOUNG** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |
| | : | |
| | : | |

**GOVERNMENT'S MOTION FOR LEAVE TO FILE THE GOVERNMENT'S
SENTENCING MEMORANDUM AND ATTACHMENTS UNDER SEAL**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully moves this Court pursuant to Federal Rule of Criminal Procedure 49.1 and Local Rule of Criminal Procedure 49(f)(6) for leave to file under seal the attached sentencing memorandum and attachments. In support of this motion, the government's memorandum and attachments contains information regarding the sexual abuse of a minor victim, which is highly sensitive information. Therefore, the government respectfully requests that this motion and any related filings are maintained under seal.

WHEREFORE, for these reasons, the United States requests that this motion for leave to file under seal be granted.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:     */s/ Janani Iyengar*
Janani Iyengar
Assistant United States Attorney
Federal Major Crimes

601 D. St N.W.
Washington, D.C. 20530
(202) 252-7760
Janani.iyengar@usdoj.go

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | CRIMINAL ACTION NO. 19-CR-365 |
| | : | |
| CHRISTOPHER YOUNG, | : | |
| Defendant. | : | |

**UNITED STATES' SENTENCING MEMORANDUM**

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully files this memorandum to aid the Court in its sentencing proceeding. The government requests this Court to sentence the defendant, Christopher Young, to 360 months of incarceration on Count One of the Superseding Information and 72 months of incarceration on Count Two of the Superseding Information, to be followed by 15 years of supervised release.

### I.    Factual Background

As described in the Presentence Report, between June 16, 2019, and June 25, 2019, the defendant 

. *See* PSR at ¶ 16. .

. Between June 16, 2019, and June 25, 2019, the defendant messaged MV1 using the Pinger application. *See* PSR at ¶¶ 18. During that time, the defendant, posing as a young girl, used different numbers on Pinger to communicate with MV1. MV1 blocked the defendant's Pinger number multiple times, and each time, the defendant communicated with MV1 on a new Pinger number. MV1 testified before the grand jury (GJ Tr.) that, while posing as the girl, the defendant asked MV1 to send him a photograph of her vagina, which she did. GJ Tr. at 16. The defendant subsequently directed MV1 to engage in sexual acts with him, and threatened to send the photograph of MV1's vagina to MV1's mother if she did not comply with the demands. *Id.* While

the Statement of Offense and PSR contain a portion of the Pinger conversation, the full conversation is contained in Attachment 1.[1] Simultaneous to the Pinger conversation, the defendant texted the victim as himself, which is attached as Attachment 2. During the Pinger chats, the defendant, posing as a young girl, initially had the following conversation with MV1 where he told MV1 to engage in a sex act with the defendant for ten seconds and asked for a picture of the act:

DEFENDANT:  Hey

DEFENDANT:  He said your haven't told him.  Maybe I should call mom

DEFENDANT:  Hey.  ███ said you haven't said anything

VICTIM:  I forgot what to tell him plz[3] don't call my mom

VICTIM:  I'm going to sleep I'll tell him tomorrow

DEFENDANT:  No

VICTIM:  I'm in the bed already

DEFENDANT:  I asked him were you sleep

DEFENDANT:  He said he in living room

VICTIM:  I'm not sleep yet

DEFENDANT:  Ok well I'll txt mom in a few minutes

VICTIM:  No

DEFENDANT:  She sounds upset already

DEFENDANT:  I called blocked

DEFENDANT:  Before 12am tell him or I'm making the call.  And you lied and said you were gon txt me cause your phone died

---

[1] Attachment A is from the Pinger conversation with the last Pinger number the defendant used to contact MV1. The prior conversations could not be extracted from the defendant's phone.

[2] ████████████████

[3] All text abbreviations and typographical errors in quote text language are original.

<u>DEFENDANT</u>:  If you go do it for 10 seconds he can take the pic I already told him

After additional conversation, the defendant and MV1 had the following exchange:

<u>DEFENDANT</u>:  Go do your 10 seconds after he change. He really want to help you so let him

    <u>VICTIM</u>:  Can I do something else other than sex stuff with my step dad

<u>DEFENDANT</u>:  It's almost 12

<u>DEFENDANT</u>:  Say ■

    <u>VICTIM</u>:  Say what

<u>DEFENDANT</u>:  Nothing. I just text him

    <u>VICTIM</u>:  Can I do something else

<u>DEFENDANT</u>:  Yea you can let him do 10 seconds!

<u>DEFENDANT</u>:  9:51 time is ticking

    <u>VICTIM</u>:  Do what for 10 seconds

<u>DEFENDANT</u>:  What he do last time

    <u>VICTIM</u>:  He told you what he did last time

<u>DEFENDANT</u>:  Yes. I asked him

    <u>VICTIM</u>:  And I said other than sex stuff with him

<u>DEFENDANT</u>:  Nope.

The defendant then continued messaging the victim over Pinger and had the following exchange with her where he instructs the victim to suck on the defendant's penis ten times:

<u>VICTIM</u>:  Why do I got to do this again

<u>DEFENDANT</u>:  at your bathroom

<u>DEFENDANT</u>:  Or in it like you're using it

<u>VICTIM</u>:  He not in my bathroom

<u>DEFENDANT</u>:  He waiting for my text

<u>DEFENDANT</u>:  Where's mom

<u>VICTIM</u>:  In her room

<u>DEFENDANT</u>:  Ok so 10 sucks

<u>DEFENDANT</u>:  Go

<u>VICTIM</u>:  He not in there

<u>DEFENDANT</u>:  He said he is

<u>VICTIM</u>:  Ok

<u>VICTIM</u>:  I did it

<u>DEFENDANT</u>:  I thought he was doin it

<u>VICTIM</u>:  No I did it

<u>DEFENDANT</u>:  Yayyyy girly.

<u>DEFENDANT</u>:  How you feel

The defendant then continued to message MV1 and had the following exchange with her where he instructed MV1 to allow her ███████ to insert his finger inside her vagina for 30 seconds or for the victim to perform oral sex on the defendant for 20 seconds:

<u>DEFENDANT</u>:  Yup last thing and that's it

<u>VICTIM</u>:  I got a headache and I'm sleepy

<u>DEFENDANT</u>:  Poor baby

<u>VICTIM</u>:  It was the last thing

<u>DEFENDANT</u>:  Nope. I don't need a picture for this one. But I will kno if you lying

<u>VICTIM</u>:  He got the picture

VICTIM:  Ok

DEFENDANT:  He sent it.

VICTIM:  Ok

DEFENDANT:  The last thing is

VICTIM:  But delete it now you see

VICTIM:  Screenshot that you deleted it

DEFENDANT:  I deleted them except for 1

VICTIM:  Delete all

DEFENDANT:  Because you have 1 more thing

VICTIM:  What is it you said that was the last thing

DEFENDANT:  I have 1 picture left

DEFENDANT:  You ready

VICTIM:  Delete them all and you said that was the last thing

DEFENDANT:  ■ have to put a finger in you for 30 seconds or you do what you did for 20

VICTIM:  You said that was the last thing

DEFENDANT:  He said can he just kiss it again though


During the course of this conversation, the defendant separately texted MV1 as himself and had the following exchange with her:

VICTIM:  She got my ■ number and my ■ number

DEFENDANT:  She said that

VICTIM:  Yes

DEFENDANT:  Ok make sure you erase

DEFENDANT:  What she talkin bout

VICTIM:  I didn't look but she said that was the last thing what we did in the bathroom

DEFENDANT:  She told me 1 more thing.

DEFENDANT:  I'm begging her to leave you alone

Attachment 2 at 1.

MV1 told the defendant over Pinger that she would not engage in any further sex acts and the defendant, still posing as the young girl, threatened to send an explicit photograph of the victim to her ████████████. The defendant and MV1 then had the following exchange:

DEFENDANT:  [Victim's biological father] texted me back

DEFENDANT:  I'm about to send him your pic lol

VICTIM:  No

DEFENDANT:  A Look. [victim's uncle] just asked who is this

VICTIM:  I'll do

VICTIM:  I'll do it tell them rong

VICTIM:  Rong number

VICTIM:  Plz I'll do it

Following this conversation, the defendant placed his mouth on the victim's vulva and took a photograph of that conduct. *See* PSR at ¶¶ 19. The defendant then emailed this photograph to himself with the subject line "████████", which stands for "████████████████████████." After the defendant placed his mouth on the victim's vulva, the defendant sent the following messages to MV1 over Pinger indicating that the defendant took a photograph of his sexual contact with MV1:

VICTIM:  I did it

      VICTIM:  Hello

DEFENDANT:  Ok I'm texting him

      VICTIM:  Who

      VICTIM:  My step dad

      VICTIM:  Hello

      VICTIM:  Who

DEFENDANT:  Sd

      VICTIM:  My ███████

      VICTIM:  Hello

DEFENDANT:  It's ██. Learn to speak in code!

      VICTIM:  Ok

      VICTIM:  He got the picture

DEFENDANT:  Hey I got the picture but it's da same thing yu did the first time are you trying to play me

      VICTIM:  No

DEFENDANT:  Maybe I should be textin [victim's biological father]

      VICTIM:  I did it again on god

      VICTIM:  I did it in the living room this time

DEFENDANT:  He was supposed to do wat he did not you

DEFENDANT:  I think y'all playin me

The defendant then had the following exchange with MV1 over Pinger, instructing MV1 to perform oral sex on the defendant again until he ejaculated:

DEFENDANT:  Make him nut

VICTIM:  What

VICTIM:  We did it

VICTIM:  He did me for 2 minute

VICTIM:  Now is it over

VICTIM:  Hello

VICTIM:  Hello

DEFENDANT:  Did he nut?  Don't lie cuz I asked him

DEFENDANT:  It's over after he nut that's what I said

DEFENDANT:  I promise

DEFENDANT:  I think you think I'm playin.

DEFENDANT:  It's ok ima call [victim's biological father] then text him the pic

VICTIM:  I'm going again because it didn't nit the first time

DEFENDANT:  I told you make him nut and it's over.  I told him the same thing!  Did he tell you what you were supposed to do

DEFENDANT:  He will take a picture after the nut so I know you did it this time

DEFENDANT:  Play with me and watch I send this to daddy

VICTIM:  Ok

DEFENDANT:  I'm not playing and he gotta do it again for 2 more minutes

MV1 subsequently messaged the defendant, who she still believed was a young girl, over Pinger and the following exchange took place:

VICTIM:  Can I do something else I got a headache and I don't feel good now plz I asking what did I do to have to do all of this

DEFENDANT:  Nope 10 minutes

VICTIM:  What did I do

<u>DEFENDANT</u>:  Ask [victim's biological father] at 12:30

<u>DEFENDANT</u>:  Let him do it

    <u>VICTIM</u>:  Do what

<u>DEFENDANT</u>:  Do sd let the tip in

<u>DEFENDANT</u>:  8 minutes

<u>DEFENDANT</u>:  7 minutes

    <u>VICTIM</u>:  Why do you want me to do this so bad

<u>DEFENDANT</u>:  Do it

<u>DEFENDANT</u>:  Time almost up

<u>DEFENDANT</u>:  Sd ain't put tip in

<u>DEFENDANT</u>:  Ok nvm ima call [victim's biological father] and yu on 3way

<u>DEFENDANT</u>:  Sad begged me but nah

<u>DEFENDANT</u>:  Sd

<u>DEFENDANT</u>:  He put tip in and nut on floor when he done

    <u>VICTIM</u>:  Plz donate I'm in pan right now I can't take no more

    <u>VICTIM</u>:  You don't know my pan

<u>DEFENDANT</u>:  Ok bout to txt him and [**victim's uncle**]

    <u>VICTIM</u>:  No

<u>DEFENDANT</u>:  Do it then sd keep telling me leave you alone but you gotta make it nut

first

<u>DEFENDANT</u>:  So what's it gonna be with 2 minutes left

<u>DEFENDANT</u>:  Yu need more time

    <u>VICTIM</u>:  Yes

<u>DEFENDANT</u>:  Ok

<u>DEFENDANT</u>:  What time then

<u>DEFENDANT</u>:  1:00am

    <u>VICTIM</u>:  11:00pm

<u>DEFENDANT</u>:  1am

    <u>VICTIM</u>:  Ok

    <u>VICTIM</u>:  I need more time than that I need to sleep on it I'm crying right now

During the course of the Pinger chats, the defendant placed his penis inside MV1's mouth twice. GJ Tr. at 18.

On June 25, 2019, MV1 reported the defendant's conduct to her mother. MV1's mother took her to the police station and subsequently to the hospital, where a Sexual Assault Nurse conducted an examination. *See* PSR at ¶¶ 20. During the examination, DNA swabs were collected from MV1's external genitalia, perianal and buttocks area, anorectal area, and thighs. Those swabs were tested for DNA and Young was included as a contributor for the DNA contained on each of the swabs. *Id.*

I.     **<u>Statutory Penalties</u>**

The defendant pled guilty to one count of Sexual Exploitation of a Child, in violation of 18 U.S.C. § 2251 and one count of Second Degree Child Sexual Abuse, in violation of 22 D.C. Code § 3009. Sexual Exploitation of a Child carries a mandatory minimum of 15 years imprisonment and a maximum sentence of thirty years imprisonment; a maximum fine of $250,000; a term of supervised release of at least five years but not more than life, pursuant to 18 U.S.C. § 3583(k); and an order of mandatory restitution, pursuant to 18 U.S.C. § 3663A. He must pay any applicable interest or penalties on fines and restitution not timely made, and a $100 special assessment. The

defendant is subject to an additional assessment in the amount of $5,000 pursuant to 18 U.S.C. § 3014(a), unless this Court finds him to be indigent at the time of sentencing. Additionally, the Court must impose mandatory restitution pursuant to 18 U.S.C. § 2259 in an amount between $3,000 and $35,000 to MV1, to reflect the defendant's relative role in the causal process underlying the victim's losses.

Second Degree Child Sexual Abuse carries a maximum sentence of ten years' incarceration.

## II.   Sentencing Guidelines

The government agrees with the Sentencing Guidelines calculation set forth in the Presentence Investigation Report (hereinafter "PSR"). According to the PSR, the U.S. Probation Office calculated the defendant's total adjusted offense level as 41, arriving at that calculation as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2G2.1(a)) | 32 |
| Specific Offense Characteristics: | |
| Victim under 12 (U.S.S.G. §2G2.1(b)(1)(A)) | +4 |
| Commission of a sexual act (U.S.S.G. §2G2.1(b)(2)(A)) | +2 |
| Knowingly engaged in distribution (U.S.S.G. §2G2.1(b)(3)) | +2 |
| ███████████████████████████████ | +2 |
| Misrepresented his identity (U.S.S.G. §2G2.1(b)(6)(A)) | +2 |
| Acceptance of responsibility U.S.S.G. §3E1.1(a) & 3E1.1(b) | -3 |
| Total Adjusted Offense Level | 41 |

*See* PSR at ¶¶ 27-41. The U.S. Probation Office calculated the defendant's Criminal History Category to be III. *Id.* at ¶ 52.

Accordingly, the U.S. Probation Office calculated the defendant's corresponding Guidelines imprisonment range to be 360 months to life. *Id.* at ¶ 95.

With respect to Count Two of the Superseding Information, the PSR correctly calculated that the offense of Second Degree Child Sexual Abuse is in Group M6 and the defendant is in Criminal History Category C. Therefore, his guideline range is 30 months to 72 months, and the defendant is eligible for a prison or long split sentence.

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007), 127 S. Ct. 2456. As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that *significantly* increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Since the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738, 160 L.Ed.2d 621 (2005), the Guidelines serve only an advisory function. *Id.* at 245, 125 S. Ct. 738. "Nevertheless, even in a post-*Booker* world in which the Guidelines are not binding, the sentencing court 'must calculate and consider the applicable Guidelines range' as its starting point." *United States v. Mattea*, 895 F.3d 762, 766 (D.C. Cir. 2018) (internal citation omitted).

### III.   A Sentence for Count One of 360 Months of Incarceration, Followed by 15 Years of Supervised Release, and A Sentence for Count 2 of 72 Months of Incarceration Accurately Reflects the 3553(a) Factors

In determining a reasonable sentence, the Court must consider the factors listed in 18 U.S.C. § 3553(a).[4]  These factors include:

(1) the nature and circumstances of the offense and the history and characteristics of the Defendant;
(2) the need for the sentence imposed –
    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B) to afford adequate deterrence to criminal conduct;
    (C) to protect the public from further crimes of the Defendant; and
    (D) to provide the Defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; and
(3) the kinds of sentences available;
(4) the applicable sentencing guidelines range for the offense;
(5) pertinent policy statements issued by the U.S. Sentencing Commission;

---
4

(6) the need to avoid unwarranted sentence disparities among Defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a); *see also United States v. Pyles*, No. CR 14-00006 (RJL), 2020 WL 376787, at *2 (D.D.C. Jan. 23, 2020); *United States v. Mitchell*, No. CR 05-00110 (EGS), 2019 WL 2647571, at *7 (D.D.C. June 27, 2019). A district court, however, "need not consider every § 3553(a) factor in every case." *In re Sealed Case*, 527 F.3d 188, 191 (D.C. Cir. 2008); *see also United States v. Fry*, 851 F.3d 1329, 1332 (D.C. Cir. 2017).

In this case, as detailed below, the Section 3553(a) factors weigh in favor of a sentence of incarceration at the high end of the guidelines for each offense, to be followed by a significant period of supervised release.

## A. The Nature and Circumstances of the Offense

The nature and circumstances of this offense are particularly disturbing. The defendant was ███████████████████████ at the time of the offense. He abused that position of trust by posing as a girl and inducing MV1 to send him a photograph of her vagina which he later used to blackmail her. The defendant then escalated his conduct by instructing MV1, ████████████████, to engage in a series of sex acts with him and threatened to send the photograph of MV1's vagina to MV1's mother if she did not comply. As the Pinger exchange continued, the defendant simultaneously texted MV1 as himself, claiming to be "begging [the individual on the Pinger application] to leave you alone." Even after MV1 told the defendant she was in pain and stated, "Plz donate [sic] I'm in pan [sic] I can't take no more," the defendant responded that he was going to text MV1's uncle a sexually explicit photo of MV1, and that MV1 needed to make the defendant ejaculate.

The defendant used ████████████████ to manipulate and terrorize MV1 so that he could sexually abuse her. The defendant's conduct is particularly malicious considering that he

created the persona on Pinger over the course of several days while messaging MV1 in order to commit the instant offense. Therefore, the nature and circumstances of the offense warrants a sentence at the high end of the guidelines.

Although the defendant pled guilty to his conduct, he has subsequently denied that he engaged in any criminal conduct in this case. In the evaluation conducted by Dr. Matt Bruce (Eval.), Dr. Bruce stated, "[w]ith respect to his understanding of the reasons he was being detained, Mr. Young's self-reported understanding appeared to fluctuate across meetings. At times he stated that he had no understanding of his charges or why he was being detained, while on other occasions he stated that he had been set up by his ███████ and he had not sexually abused the victim." Dr. Bruce subsequently stated that the defendant "speculated that [MV1's mother] 'set him up' by taking compromising photos of him with ██████ when he was intoxicated." The defendant's utter unwillingness to accept any responsibility for his conduct after entering his guilty plea demonstrates a lack of remorse for his conduct and weighs in favor of a lengthy sentence.

**B.  History and Characteristics of the Defendant**

The defendant has a history of contacts with the criminal justice system, including a 2018 conviction for Attempted Robbery and Robbery in D.C. Superior Court. At the time of the instant offense, the defendant was on probation supervision for the robbery conviction. The fact that he committed the instant offense while under supervision demonstrates that the Court should impose a lengthy sentence of incarceration because the defendant cannot be trusted to comply with the law once he is released.

**C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and Provide Just Punishment for the Offense**

This factor is known as the "just desserts" concept, answering the need for retribution so that the punishment fits the crime, and the Defendant is punished justly. *See United States v. Irey*,

612 F.3d 1160, 1206 (11th Cir. 2010). The *Irey* court cited the Senate Report regarding this provision:

> This purpose--essentially the "just desserts" concept--should be reflected clearly in all sentences; it is another way of saying that the sentence should reflect the gravity of the Defendant's conduct. From the public's standpoint, the sentence should be of a type and length that will adequately reflect, among other things, the harm done or threatened by the offense, and the public interest in preventing a recurrence of the offense. (Quoting S.Rep. No. 98-225, at 75-76, 1984 U.S.C.C.A.N. 3258-59). *Id.*

The defendant's conduct in this matter did not consist only of taking a sexually explicit photograph of a child, but also involved abusing his position of authority and trust to manipulate MV1 in order to sexually abuse her. The defendant's conduct is at the extreme end of the spectrum in terms of cases involving the sexual exploitation of children, therefore, a sentence at the high end of the guidelines would adequately reflect the seriousness of the offense.

### D.  The Need for the Sentence Imposed to Afford Adequate Deterrence

Congress, the Supreme Court, and the Sentencing Commission believe general deterrence is a very important factor when considering an appropriate sentence. *See United States v. Fry*, 851 F.3d 1329, 1332 (D.C. Cir. 2017) (the sentence would deter Fry and "others who may be inclined in doing similar kinds of things."). As stated in *United States v. Goldberg*, "[s]entences influence behavior, or so at least Congress thought when in 18 U.S.C. § 3553(a) it made deterrence a statutory sentencing factor." *United States v. Goldberg,* 491 F.3d 668, 672 (7th Cir. 2007).

For the reasons stated above, 18 U.S.C. § 3553(a)(2)(B) dictates that a sentence of 360 months, to be followed by 15 years of supervised release, is appropriate to deter similarly egregious and harmful conduct.

### E.  The Need for the Sentence Imposed to Protect the Public from Further Crimes of the Defendant

A sentence of incarceration at the high end of the guidelines is appropriate to protect the public from further crimes committed by the defendant. The defendant's crime was committed against a victim that was particularly vulnerable ██████████████████████ and had unfettered access to her. This crime was also committed in a particularly calculated and malicious way, and demonstrates his sexual interest in children. The circumstances of the offense along with the defendant's unwillingness to accept responsibility indicate that if he is released into the community again, he would likely reoffend. Therefore, a lengthy sentence is warranted to protect the community from the defendant's future crimes.

### F.  The Need to Avoid Unwarranted Sentence Disparities among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct

Section 3553(a)(6) directs courts to consider the need to avoid *unwarranted* disparities among defendants "with similar records who have been found guilty of similar conduct." It "does not require the district court to avoid sentencing disparities between defendants who might not be similarly situated." *United States v. Mattea*, 895 F.3d 762, 768 (D.C. Cir. 2018) (quoting *United States v. Guillermo Balleza*, 613 F.3d 432, 435 (5th Cir. 2010).

In a case with a very similar fact pattern, Judge Contreras issued a sentence of 360 months incarceration for Sexual Exploitation of a Child and 204 months for First Degree Child Sexual Abuse, to run partially concurrent so that an aggregate sentence of 372 months would be served. *United States. V. Chandler*, 18-cr-203 (D.D.C.). In *Chandler*, the defendant was the ████████ ██████ of the minor victim. During a text message conversation, the defendant posed as a young boy that the minor victim was romantically interested in. In the text messages, the defendant, posing as the young boy, told the minor victim that he would not date her unless she had "training" from the defendant. The defendant informed the minor victim that "training" required him to engage in sexual contact with the minor victim. The defendant photographed his sexual contact

with the minor victim. A sentence of 360 months for Count One and 72 months for Count Two, would not result in a sentencing disparity and is aligned with Judge Contreras' sentence in *Chandler*.[5]

## IV.   The Victim Is Entitled to Restitution

In child pornography cases, restitution is mandatory to any person "harmed as a result of" a defendant's crime pursuant to 18 U.S.C. § 2259. *See* 18 U.S.C. § 2259(a), (c); *see also United States v. Monzel*, 930 F.3d 470, 476 (D.C. Cir. 2019); *United States v. Hite*, 113 F. Supp. 3d 91, 94 (D.D.C. 2015) (Under 18 U.S.C. § 2259, restitution is mandatory for victims of certain federal crimes, including child pornography offenses.) Restitution includes "the full amount of the victim's losses," which may include any costs incurred by the victim for:

> (A) Medical services relating to physical, psychiatric, or psychological care;
> (B) Physical and occupational therapy or rehabilitation;
> (C) Necessary transportation, temporary housing, and child care expenses;
> (D) Lost income;
> (E) Attorneys' fees, as well as other costs incurred; and
> (F) Any other losses suffered by the victim as a proximate result of the offense.

18 U.S.C. § 2259(a), (b)(3); *see also United States v. Hite*, 113 F. Supp. 3d 91, 94 (D.D.C. 2015).

Here, the offense of conviction is a child pornography trafficking offense, as defined in 18 U.S.C. § 2259(c)(3). Therefore, the Court shall determine the full amount of the victim's losses and shall order restitution in an amount that reflects the defendant's relative role in the causal process that underlies the victim's losses, but which is not less than $3,000. 18 U.S.C. § 2259(b)(2).

In *Paroline v. United States*, 134 S. Ct. 1740 (April 23, 2014), the United States Supreme Court faced a circuit split over the interpretation of 18 U.S.C. § 2259, specifically over "how to determine the amount of restitution a possessor of child pornography must pay to the victim whose

---

[5] Undersigned counsel searched the United States Sentencing Commission's Judiciary Sentencing Information database for cases involving defendants with the same guidelines calculation and criminal history category. The database indicated that there was insufficient data for individuals in this category to produce a report.

childhood abuse appears in the pornographic materials possessed." *Paroline*, 134 S. Ct. at 1716.

In *Paroline*, the defendant possessed two images of the victim who was seeking restitution. The

Court's answer to this question involved three steps.

First, *Paroline* held that, because the statute defined a "victim" as someone "harmed as a

result" of the offense, restitution under § 2259 was proper "only to the extent the defendant's

offense proximately caused a victim's losses." *Id*. at 1722.

Second, the Court held that "proximate cause" under § 2259 did not require strict but-for

causation. *Id*. at 1726-27. Recognizing that under the circumstances of most child pornography

possession cases – where losses resulted from harm caused by the trafficking of a victim's images

by numerous "geographically and temporally distant offenders acting independently, and with

whom the defendant had no contact," *id*. at 1725, - the Court held:

> In this special context, where it can be shown that a defendant possessed a victim's
> images and that a victim had outstanding losses caused by the continuing traffic in
> those images but where it is impossible to trace a particular amount of those losses
> to the individual defendant by recourse to a more traditional causal inquiry, a court
> applying § 2259 should order restitution in an amount that comports with the
> defendant's relative role in the causal process that underlies the victim's general
> losses.

*Id*. at 1727. The Court made clear that, where the victim's losses are "the product of the acts of

thousands of offenders," a restitution order should not be "too severe" but must not be merely "a

token or nominal amount." *Id.* That is, in part, because a restitution order under § 2259 serves

"twin goals," the first being to "help[] the victim achieve eventual restitution for all her child-

pornography losses" and second to "impress[] upon offenders the fact that child pornography

crimes, even simple possession, affect real victims." *Id.*

Third, the Court provided sentencing courts the following guidance for how to determine

the proper amount of restitution under this standard. *Id*. The Court noted that a sentencing court's

goal should be to assess "the significance of the individual defendant's conduct in light of the broader causal process that produced the victim's losses," taking into account any "available evidence." *Id*. at 1727-28. The Court emphasized that there is no "precise mathematical inquiry" governing this determination and that district courts must exercise "discretion and sound judgment" in fashioning restitution awards. *Id*. at 1728. The Court suggested several factors to be considered, including: (1) the number of defendants convicted of possessing the victim's images; (2) the number of future offenders likely to be caught and convicted; (3) whether the defendant had any role in the initial production of the images; (4) whether the defendant reproduced or distributed the images; (5) how many images the defendant possessed; and (6) "other facts relevant to the defendant's relative causal role." *Id*. "These factors need not be converted into a rigid formula, especially if doing so would result in trivial restitution orders. They should rather serve as rough guideposts for determining an amount that fits the offense." *Id*.

Congress has since amended Section 2259 to both codify *Paroline*'s basic approach and to set a restitution floor of $3,000. *See* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299, 132 Stat. 4383 (2018).

The government has communicated with MV1's mother who intends to read a victim impact statement from MV1 to the Court during the sentencing hearing. Additionally, MV1's mother has indicated that she is seeking $4,000 in restitution for therapy costs for MV1 related to the defendant's conduct. MV1's mother has indicated that she will provide supporting documentation for the restitution request at the sentencing hearing.

**V.**     **Conclusion**

The Government respectfully requests that the Court sentence the defendant to a period of

360 months of incarceration on Count One, and 72 months of incarceration on Count Two to be

followed by 15 years of supervised release.


Dated:  Dec. 6, 2022                              Respectfully submitted,


                                                  MATTHEW M. GRAVES
                                                  UNITED STATES ATTORNEY


                                                   _/s/ *Janani Iyengar*____
                                                  Janani Iyengar
                                                  NY Bar No. 5225990
                                                  Assistant United States Attorney
                                                  Karen Stauss, D.C. Bar Number 499725
                                                  Special Assistant United States Attorney
                                                  601 D Street, NW
                                                  Washington, D.C. 20530
                                                  Telephone: (202) 815-2358
                                                  Email: Karen.Stauss2@usdoj.gov